**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| JANE DOE ) <br>     A Domiciliary of the ) <br>     Commonwealth of Virginia ) <br> ) <br>     Plaintiff, ) <br> ) <br>         v. ) <br> ) <br> CENK SIDAR ) <br> ) <br>     Defendant. ) | Civil Action No. _____ <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiff Jane Doe,[1] by and through her attorneys Fletcher, Heald and Hildreth, PLC and Steimel Counselors Law Group, PLLC[2], for her Complaint against Defendant Cenk Sidar, avers upon her personal knowledge as to her own acts and status and upon information and belief and to all other matters as follows:

## NATURE OF THE ACTION

1. This suit arises out of Defendant's brutal and criminal sexual assault and battery of Plaintiff, without her consent, when she was attending a military defense conference in London.

2. Plaintiff originally brought this action in the Circuit Court of Fairfax County on September 13, 2019. Both parties to that action actively participated in the case and discovery on the merits until November 19, 2021, when Plaintiff filed for non-suit pursuant to Virginia Code § 8.01-380 as to all claims.

3. While the Fairfax County Court had initially ordered Defendant to provide DNA and other samples to Plaintiff, subsequent filings by Defendant and rulings of the Circuit Court frustrated Plaintiff's attempts to obtain Defendant's DNA, even though Defendant voluntarily provided DNA samples to the Metropolitan Police of London immediately after the sexual assault, without limitation or qualification.

---

[1] Contemporaneously with this filing Plaintiff files a Motion to Proceed under a Pseudonym pursuant to the five-part test set forth in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993) and Virginia Code § 8.01-15.1, explaining the precise factual and legal basis upon which Plaintiff seeks to proceed in this case. A similar request was granted by the Fairfax County Court in the earlier proceeding in this case.

[2] Mr. Steimel of Steimel Counselors Law Group PLLC will file a *pro hac vice* application.

4.      Upon presenting her notice of nonsuit, Plaintiff's counsel noted that the mechanisms and procedures for obtaining the Defendant's DNA were more established in Federal Court, and that Plaintiff was exercising her right to file for a nonsuit in the Circuit Court and move the matter to Federal Court. Plaintiff's counsel will also request cooperation with the Metropolitan Police of London and judicial authorities in the U.K. under the Hague Convention and pursuant to applicable mutual assistance treaties in order to obtain DNA and other evidence in their possession that are relevant to the matters in this case.

5.      This action has been timely filed pursuant to Virginia Code § 8.01-380 and the statute of limitations has been preserved pursuant to such statute applicable to nonsuits. This action has been filed within the applicable six (6) month period from the date of nonsuit.

## PARTIES

6.      Plaintiff is a natural person and a domiciliary of the Commonwealth of Virginia.

7.      Defendant, who was born in Turkey, is a natural person and dual national of Turkey and the United States, and is currently residing in Washington, D.C. Defendant also resided in Washington, D.C. at the time Plaintiff filed her original Complaint. Defendant is currently employed by Enquire AI, Inc., a Washington, D.C. based company which is incorporated in Delaware.  Enquire AI is the successor to GlobalWonks LLC, Defendant's employer at the time he committed his assault and at all times from then to the present.

## JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction over this dispute pursuant to 29 U.S.C. § 1332(a)(2). Plaintiff is a resident of Virginia and Defendant is a resident of Washington, D.C., and the amount in controversy exceeds the sum or value of $75,000.00 excluding interest and costs.

9. Venue is proper in this Court under (i) 28 U.S.C. § 1391(b)(1) because the Defendant resided in the Commonwealth at the time that he brutally sexually assaulted Plaintiff in London, even though he is now a resident of the District of Columbia; and (ii) 28 U.S.C. § 1391(b)(2) because Plaintiff's damages from personal harm and trauma from Defendant's brutal sexual assault were sustained and continue to be sustained in her domicile, the Commonwealth.

10. This Court has personal jurisdiction over Defendant. The Circuit Court previously determined that Defendant was both a resident of the Commonwealth of Virginia at the time he assaulted Plaintiff, and had significant business contacts in the Commonwealth. The Defendant actively participated in the Circuit Court action issuing and responding to discovery on the merits and filing multiple motions in that case, waiving any objection to personal jurisdiction. Fairfax County Court (J. Bellows) determined, after a hearing and upon an Order entered June 16, 2020, that the Fairfax County Circuit Court had personal jurisdiction over Defendant finding "1) Defendant regularly conducted business in the Commonwealth, 2) Defendant engaged in any other persistent course of conduct in the Commonwealth, or 3) Defendant derived substantial revenue from services rendered in Virginia, any <u>one</u> of which would be sufficient to find jurisdiction."[3]

## FACTS COMMON TO ALL COUNTS

11. Defendant is a "global risk executive with extensive experience assisting top financial institutions, multinational corporations, risk management firms, and legal firms operating in high-risk regions." On or about September 12, 2017, he was in London, England for business.

---

[3] Judge Bellows' Order is attached as Exhibit 1.

4

12.     Defendant was (and still is) working for Enquire AI, Inc., a Washington, D.C. based company which is the successor to GlobalWonks LLC, where he was and is Co-Founder and CEO.

13.     Defendant was in London for company business.

14.     At the time, Jane Doe was a 36-year-old domiciliary of the Commonwealth of Virginia who was visiting London for a military defense show.

15.     Both Defendant and Plaintiff had attended the Johns Hopkins' School of International Studies (SAIS) approximately ten (10) years earlier and knew each other casually from that time.  Defendant and Plaintiff had never dated nor were they ever previously romantically involved with each other.

16.     Plaintiff posted on Facebook that she would be in London, England, from September 9 to September 14, 2017, to attend a military defense conference.  Defendant noted that he would be there at the same time, and Plaintiff suggested that they meet for coffee during the week.

17.     Over coffee, Defendant informed Plaintiff that a SAIS alumni reception was taking place in London on September 15, 2017, and that dinner with a mutual friend was taking place on September 16, 2017.  He suggested that she extend her stay to attend both events.

18.     Plaintiff only had housing arrangements in London, however, through September 14, and it was too late to find a reasonably priced hotel room for the weekend given the lateness of the notice.

19.     On or about September 13, 2017, Defendant offered his apartment, in the SoHo area of London, as an alternative and free place to stay for the extra two days. Plaintiff accepted

5

solely because she trusted Defendant and did not believe that he would make any attempt to take advantage of her.

20. On or about September 15, 2017, when Plaintiff arrived at Defendant's rented Airbnb apartment at 13 Brewer Street, Soho, London, Plaintiff discovered it was a small studio apartment. Defendant invited Plaintiff to stay in the apartment's bed and stated that he would sleep on the sofa in the living room area. Plaintiff agreed to this arrangement because she trusted Defendant, believed that they had a platonic friendship, and knew that Defendant was married with children.

21. Plaintiff and Defendant attended the SAIS alumni reception at Leadenhall Market, and each had two or three glasses of wine that evening at the reception. Afterwards, the Plaintiff had one more glass of wine and the Defendant had three more cocktails at a bar two blocks from the apartment. They returned to the apartment at approximately 12:00 a.m. and were not inebriated when they retired to their respective sleeping spaces – Plaintiff in the apartment's bed, Defendant on the sofa.

22. In the middle of the night of September 15, 2017, Defendant attempted to get into bed with Plaintiff and placed his arm around Plaintiff's torso.

23. Plaintiff removed his arm and verbally asked Plaintiff to stop. Defendant claimed that he was cold sleeping on the sofa without a blanket. Plaintiff offered to allow Defendant to have her blanket and return to the sofa or that she would sleep on the sofa and he could have the bed. She moved to the far side of the bed to separate herself as far as possible from Defendant and fell back asleep. Nothing further happened that night.

24. At lunch the next day, September 16, 2017, Plaintiff specifically told Defendant that he had scared her by his unwanted contact the night before and that he should not "do that"

6

(make any further similar physical or romantic overtures toward her). Plaintiff stated that she did not know Defendant's wife, but was sure that his wife would not appreciate his behavior. Defendant assured Plaintiff that he was just cold and would not attempt any more romantic or physical advances. Plaintiff repeated her offer to sleep on the sofa, but Defendant refused to accept this offer.

25. Later that night, Defendant and Plaintiff met some friends for dinner, as planned, including another mutual friend from SAIS, two employees of Defendant, and several friends of Defendant's from Turkey. Plaintiff spent most of dinner talking to a mutual friend.

26. The group went to a bar after dinner and at approximately 2:00 am London time on September 17, 2017, Defendant and Plaintiff returned to Defendant's apartment.

27. Plaintiff got into bed and fell asleep. After an undetermined period of time, she felt something touching her between her legs. Plaintiff struggled to orient herself and the origin of the object touching her. Alarmed that it was the Defendant touching her between her legs, she said no and specifically told him to stop.

28. Instead, Defendant increased his activity between Plaintiff's legs.

29. Although Plaintiff was wearing pajamas, Defendant had pulled them to the side and entered Plaintiff's vagina with his penis.

30. At no time did Plaintiff consent to any such vaginal penetration or, in fact, to any other romantic interaction.

31. Defendant penetrated Plaintiff's vagina without any attempt to use a condom or otherwise protect Plaintiff from any sexually transmitted diseases or potential pregnancy.

7

32. At first, Defendant continued his unauthorized penetration of Defendant. Plaintiff had to become very physically aggressive to get Defendant off of her, as Defendant continued to try to continue to rape her despite her protests.

33. After substantial effort to get Defendant to stop, she was able to push him off of her. Plaintiff yelled "stop it! what's wrong with you? What the %#&! are you doing?!" As he retreated, Defendant stated that he was "sorry."

34. Plaintiff grabbed her belongings, put on jeans and a jumper over her pajamas that had been soiled by Defendant, and ran out of the apartment.

35. Later that morning, Plaintiff reported the attack to a London hospital and a London medical clinic specializing in sexual assault.

36. Defendant continued to harass Plaintiff through repeated texts and phone calls, during which he admitted that he had raped her without her consent.

37. Through repeated texts over several days Defendant begged Plaintiff for forgiveness and not to tell anyone what he did because it "would ruin my life fully" and "destroy my life."

38. Through repeated texts over several days Defendant pleaded with Plaintiff to take no action and remain silent stating "my life would be ruined if anyone hears this;" "starting a legal case or letting everyone know about this incident will kill me;" "I am just asking you not to ruin my reputation and life at this point;" and "I am luck [sic] it happened with you, at least a friend or something."

39. Through repeated texts over several days Defendant admitted his unwanted and unprovoked attack stating "it wasn't who I am;" "it was a drunken accident;" "it kills me that I did this to you;" "you did not deserve for what happened;" and "I basically acted like an animal."

40. Plaintiff attaches a copy of the text messages containing harassment, excuses and admissions.[4]

41. Plaintiff has suffered, and continues to suffer, substantial damages including, but not limited to, extreme and permanent pain and suffering, humiliation, and mental distress.

42. Plaintiff has suffered, and continues to suffer, emotional distress so severe as to be accompanied by physical manifestations such as anxiety, nausea, sleeplessness, flashbacks, and hyper-vigilance.

43. Plaintiff has sought and received medical and psychological treatment for these injuries caused by Defendant's action.

44. Moreover, Plaintiff has incurred substantial medical expenses, therapy costs, and lost wages and revenues as a result of Defendant's actions.

### COUNT I
### (Assault & Punitive Damages)

45. Plaintiff incorporates by reference all of the allegations of facts contained elsewhere in this Complaint.

46. Defendant's forced sexual contact and brutal physical assault upon Plaintiff caused Plaintiff to be in reasonable apprehension of imminent bodily harm.

47. Defendant's forced sexual and physical contact made Plaintiff fear for her life and that he would not only rape her, but do additional physical injury to her.

48. Defendant acted with the intent and capability to do bodily harm to Plaintiff when he and committed forcible and unwanted vaginal penetration without a condom.

---

[4] A redacted copy of the text messages is attached as Exhibit 2.

49.     Defendant's forced sexual contact would constitute rape under Virginia Code §18.2-61 and criminal sexual battery under Virginia Code §18.2-61 had the attack occurred in Virginia.  Similarly, he violated comparable English criminal and civil laws.

50.     Defendant lacked privilege or permission to engage in these harmful and offensive acts. Defendant knew or should have known he lacked such privilege or permission because Plaintiff physically resisted the Defendant and verbally expressed a lack of consent to the physical and sexual contact at all times.

51.     As a direct and proximate result of Defendant's brutal sexual assault, criminal acts and actions, Plaintiff suffered, and continues to suffer, substantial damages including, but not limited to, extreme and permanent pain, suffering and emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, mental distress, medical expenses, invasion of privacy and lost wages.

52.     Defendant's attack of Plaintiff was willful and outrageous and was characterized by evil motive, intent to injure, ill will, fraud, gross negligence, recklessness and willful indifference and was done with actual malice given her repeated and clear attempts to physically and verbally resist at all times. His actions shock the conscience and are so outrageous as to warrant the award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendant for two million dollars ($2,000,000.00) in compensatory damages and four million dollars ($4,000,000.00) in punitive damages plus interest,  costs, and any other relief this Court deems just and proper.

## COUNT II
### (Battery & Punitive Damages)

53.     Plaintiff fully incorporates by reference the allegations set forth in the preceding paragraphs.

54. Defendant committed acts that constitute harmful and offensive contact on Plaintiff on November 15, 2017. Specifically, Defendant took advantage of Plaintiff while she slept and engaged in forcible and unwanted vaginal penetration of Plaintiff while she physically resisted Defendant and verbally expressed a lack of consent to the physical and sexual contact.

55. Defendant's harmful and offensive vaginal penetration was committed willfully and intentionally and with actual malice in an effort to exercise power and control over Plaintiff, to humiliate her, and to gain sexual gratification without regard to the physical and emotional harm Defendant knew or should have known would result to Plaintiff from his actions.

56. Defendant's forced sexual contact would constitute rape under Virginia Code §18.2-61 and criminal sexual battery under Virginia Code §18.2-61 had the attack occurred in Virginia. Similarly, he violated comparable English criminal and civil laws.

57. Defendant lacked privilege or permission to engage in these harmful and offensive acts. Defendant knew or should have known he lacked such privilege or permission because Plaintiff physically resisted the Defendant and verbally expressed a lack of consent to the physical and sexual contact at all times.

58. As a direct and proximate result of Defendant's brutal sexual assault, criminal acts and actions, Plaintiff suffered, and continues to suffer, substantial damages including, but not limited to, extreme and permanent pain, suffering and emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, mental distress, medical expenses, invasion of privacy and lost wages.

59. Defendant's attack of Plaintiff was willful and outrageous and was characterized by evil motive, intent to injure, ill will, fraud, gross negligence, recklessness and willful indifference and was done with actual malice given her repeated and clear attempts to physically

11

and verbally resist at all times. His actions shock the conscience and are so outrageous as to warrant the award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendant for two million dollars ($2,000,000.00) in compensatory damages and four million dollars ($4,000,000.00) in punitive damages plus interest, costs, and any other relief this Court deems just and proper.

## COUNT III
### (Intentional Infliction of Emotional Distress & Punitive Damages)

60. Plaintiff incorporates by reference all of the allegations of facts contained elsewhere in this Complaint.

61. On September 15, 2017, Defendant engaged in the brutal attack of Plaintiff who physically resisted Defendant and verbally expressed a lack of consent to the physical and sexual contact.

62. Defendant's forced vaginal penetration and bodily attack were so outrageous as to shock the conscience and to exceed the bounds of human decency.

63. Defendant's conduct was willful, outrageous, reckless, and in deliberate disregard of a high degree of probability that emotional distress would result to Plaintiff given her ongoing physical resistance and verbal expressions of her lack of consent to the physical and sexual contact.

64. Defendant's forced sexual contact would constitute rape under Virginia Code §18.2-61 and criminal sexual battery under Virginia Code §18.2-61 had the attack occurred in Virginia. Similarly, he violated comparable English criminal and civil laws.

65. Defendant lacked privilege or permission to engage in these harmful and offensive acts. Defendant knew or should have known he lacked such privilege or permission

because Plaintiff physically resisted the Defendant and verbally expressed a lack of consent to the physical and sexual contact at all times.

66. As a direct and proximate result of Defendant's forced sexual and physical contact and criminal conduct, Plaintiff has suffered, and continues to suffer substantial damages, emotional distress so severe as to be accompanied by physical manifestations such as nausea, vomiting, sleeplessness, hyper vigilance, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

67. Defendant's attack of Plaintiff was willful and outrageous and was characterized by evil motive, intent to injure, ill will, fraud, gross negligence, recklessness and willful indifference and was done with actual malice given her repeated and clear attempts to physically and verbally resist at all times. His actions shock the conscience and are so outrageous as to warrant the award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendant for two million dollars ($2,000,000.00) in compensatory damages and four million dollars ($4,000,000.00) in punitive damages plus interest, costs, and any other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendant, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; injunctive relief; and such other and further relief as the Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff Jane Doe respectfully demands trial by jury of all issues so triable in this case.

May 12, 2022                                              Respectfully Submitted,

JANE DOE by
THE LAW FIRM OF FLETCHER, HEALD &
HILDRETH, PLC

By:   /s/ Thomas F. Urban II
THOMAS F. URBAN II, VSB #40540
FLETCHER, HEALD & HILDRETH, PLC
1300 17th Street North, Suite 1100
Arlington, Virginia 22209
(703) 812-0462; (703) 812-0486 (f)
urban@fhhlaw.com

Walter E. Steimel, Jr.
STEIMEL COUNSELORS LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258; (202) 652-2308
wes@sclgrp.com
Applying for *pro hac vice*

*Counsel for Plaintiff Jane Doe*